330 So.2d 919 (1976)
Willie MITCHELL, Plaintiff-Appellee-Relator,
v.
The EQUITABLE EQUIPMENT COMPANY, Defendant-Appellant-Respondent, and
Continental Assurance Company, Defendant-Appellee-Respondent.
No. 57081.
Supreme Court of Louisiana.
March 29, 1976.
Rehearing Denied May 14, 1976.
J. Michael Cumberland, Badeaux, Discon, Cumberland & Barbier, New Orleans, for plaintiff-applicant.
Francis G. Weller, Deutsch, Kerrigan & Stiles, New Orleans, for defendant-respondent, Continental Assurance Co.
Robert E. Winn, Walter C. Thompson, Jr., Sessions, Fishman, Rosenson, Snellings & Baisfontaine, New Orleans, for defendant-respondent, Equitable Equipment Co.
*920 TATE, Justice.
The plaintiff became totally disabled while working for Equitable Equipment Company. Equitable provided long-term disability income insurance protection for its employees. The plaintiff sues Equitable.[1]
The trial court awarded the plaintiff judgment against Equitable for disability benefits. The court of appeal reversed. 319 So.2d 552 (La.App. 4th Cir. 1975). We granted certiorari, 329 So.2d 753 (1975), because we wished to examine the court of appeal's conclusion that a disability protection furnished by an employees' group policy did not cover a subsequent disability solely or concurrently caused by a pre-existing (but previously not manifestly-disabling) disease.
We find that the plaintiff employee's present disability is covered. Ultimately, we rest this determination upon our factual conclusion that the disability results both from an ulcer (which did not pre-exist the coverage), as well as from a pre-existing disease, lipoid proteinosis (which did pre-exist the coverage).
The court of appeal found that, under the policy definitions, the causation of the disability by the pre-existing disease precluded coverage. Before discussing the policy clauses at issue, we deem it appropriate to set forth the basis for our factual conclusion.

(1)
The plaintiff Mitchell worked as a welder for the defendant Equitable from May, 1967 until February, 1971. Except for a short hernia-caused disability in July 1970, Mitchell worked continuously for Equitable without disability or loss of sicktime during those four years. His present disability commenced in February 1971, initially resulting from a stomach ulcer. He has been continuously disabled since that time.
Mitchell's present disability also results from lipoid proteinosis, a very rare tissue disease affecting his tongue and throat. This disease had first manifested itself (undiagnosed) during his military service in 1945. In 1957, when the disease was first diagnosed, it again manifested itself, this time in a disabling state. During the next ten years, Mitchell was recurrently hospitalized, received extensive treatment, and for a time received veterans disability benefits.
However, the disability benefits were terminated. Mitchell returned to work as a welder in 1966. He entered the present defendant's employment in 1967. The lipoid proteinosis was in a period of remission during this entire time from 1966 through 1917, until it again manifested itself in disabling form during the period of disability initially caused by the ulcer.
As will later be seen by a summary of the medical evidence, the disability from the ulcer (stomach pains and cramps) has persisted since February 1971. From about April 1971, a concurrent cause of the plaintiff's disability results from his lipoid proteinosis disease (tongue and throat swelling, causing shortness of breath). The ulcer disability would normally have been cured; but the steroid treatment for the lipoid proteinosis may be at least a partial cause for the prolongation of the disabling symptom resulting from the ulcer.
In any event, the medical evidence, as we read it, preponderantly shows that the present disability results both from the ulcer and from the lipoid proteinosis. The *921 medical evidence is further uncontradicted that the disability resulting from the ulcer will persist indefinitely and is permanent, within the definition of the insurance coverage.

(2)
Equitable provided group health, accident, life and disability protection for its employees, as part of the compensation paid them for their services. During the plaintiff's employment, Equitable secured successive policies from various insurers.
On April 1, 1970, it secured such insurance from Continental, including a group long-term disability income insurance protection. This policy provided for long-term disability benefits for an employee who "becomes totally disabled solely because of injury or sickness from performing each and every duty pertaining to his occupation and remains continuously so disabled * * *."
On December 1, 1970, Equitable cancelled this disability coverage with Continental and contractually agreed to provide the same protection itself. The present disability commenced on February 10, 1971, during Equitable's contractual assumption of such coverage.
The successive group coverages were provided without any requirement of medical examination, nor were Equitable's employees required to fill out medical statements by Continental or the other insurers. As the trial court found, no issue is present of any misrepresentation or other fraudulent conduct by Mitchell, the insured employee.

(3)
On February 10, 1971, Mitchell was hospitalized for a perforated peptic (stomach) ulcer. He has been under continuous treatment for it since then. We regard the medical evidence as uncontradicted that the peptic ulcer residual is by itself disabling:
Due to stomach pains and cramps (which require continuous medication), Mitchell is totally disabled. He cannot perform the arduous duties expected of him as an industrial welder, which involve a great deal of climbing and physical exertion.
Following February 10, 1971, a re-manifestation occurred of a latent condition resulting from lipoid proteinosis. The latter is a rare congenital disease affecting the membranes of his mouth and throat. Its cause, or the causes for its re-manifestations and remissions, are not known to medical science.
Except for hoarseness of the throat, this disease had not manifested itself in Mitchell since 1966, or at least by any objective symptom of a disabling nature. However, commencing shortly after the ulcer hospitalization episode, the prior long recessive stage of the disease ended. Due to swelling of the throat membranes and its aggravation by irritants present in an industrial background, Mitchell is not able to perform his arduous duties by reason of this condition, if only because of the resulting shortness of breath upon exertion.
The congenital disease (lipoid proteinosis) is of unknown causation. It is a progressive disease, but with periodic remissions and re-manifestations. It affects the skin and mucous membrance, especially (as here) the tongue, throat, and larnyx.[2]
The medical evidence is uncontradicted that the peptic ulcer condition was not caused by the lipoid proteinosis. However, the evidence also indicates that, without this underlying disease, Mitchell's peptic *922 ulcer disability would not have persisted indefinitely, as it has.
The three medical witnesses who testified are in substantial accord.
Dr. Cairns, a throat specialist, testified as to the existence and disabling nature of the lipoid proteinosis condition. He did not examine for or opine as to the disability resulting from the ulcer.
Dr. Stafford, a general practitioner, has treated Mitchell for his ulcer condition since February, 1971. He found him disabled both because of the ulcer (stomach pain and cramps, etc.) and also because of the lipoid proteinosis (throat irritation, causing shortness of breath).
This witness concedes that the ulcer condition, without the proteinosis complications, might not continue to be permanently disabling. However, the ultimate conclusion of his testimony is that the ulcer condition, for which he is treating Mitchell, remains indefinitely disabling. His testimony as a whole, and his prior medical reports indicate his belief that the proteinosis disability is secondary to that caused by the ulcer.
Dr. Martz, an internal medicine specialist, examined the plaintiff on behalf of Equitable. The plaintiff called him as a witness. Dr. Martz's testimony is positive to the effect that he found the plaintiff disabled both because of the ulcer (stomach pains) and of the proteinosis (throat swelling), as well as by reason of arteriosclerosis.
We do not believe that these positive findings by him of the concurrent causes of the plaintiff's disability, (which commenced with the ulcer attack of February 10, 1971 and has persisted continuously since then) are contradicted by his reply to the last of four questions asked him on cross-examination by Equitable's astute counsel.
The last two of these questions were as follows:
"Q. And you said in your opinion he was permanently disabled?
"A. That's true.
"Q. I know, Doctor, it is often very hard to draw a clearcut black and white line, but I'm going to ask you one direct question: In Mr. Mitchell's case you have three findings; what of those three conditions renders him, in your opinion, permanently disabled and totally disabled"
"A. The lipoid proteinosis."
In the context of the question, the medical witness was asked to express his opinion as to which one of the three disabling conditions he found rendered Mitchell "totally and permanently disabled". In the context of his entire testimony, the reply indicates that the lipoid proteinosis condition was, of the three disabling conditions, medically the most serious and the most permanent (incurable).
In the context of the witness's entire testimony, however, this opinion does not detract from his firmly expressed opinion that the ulcer condition was also presently producing total disability of indefinite duration. The expert's opinion rather recognizes that the ulcer condition itself, if not inhibited from cure by the lipoid proteinosis condition and treatment, is ordinarily of a less permanently disabling nature, as Dr. Stafford had testified.
We thus find that, commencing with February 10, 1971, the plaintiff Mitchell has been disabled both because of the ulcer residual and also, commencing shortly afterwards, because of the re-manifestation of his lipoid proteinosis.

(4)
We also note that, prior to the 1971 ulcer disability, the plaintiff Mitchell was free of disability or of any disabling manifestation of lipoid proteinosis. This latter pre-existing congenital disease is of unknown causation, both as to its original *923 manifestation and to its subsequent periods of remission and recurrence.
After the ulcer disability manifested itself, the proteinosis disability again recurred. Since 1971, the disability has persisted continuously as disabling because of the ulcer (stomach) residual, in addition to the throat (proteinosis) condition also causing disability.
Under these circumstances, the legal cause of the disability has sometimes been held to be the condition initially causing the disability that continuously manifests itself thereafter, rather than some pre-existing latent medical disease or predisposition which is activated by the precipitating initial condition or which aggravates the latter's duration.
See: Moore v. Prudential Insurance Company of America, 278 So.2d 481 (La. 1973); Jordan v. Travelers Insurance Co., 231 So.2d 678 (La.App. 1st Cir. 1970), affirmed (on this issue, but without discussion of it) 257 La. 995, 245 So.2d 151 (1971); Morris v. Kaiser Aluminum and Chemical Co., 228 So.2d 261 (La.App. 1st Cir. 1969).
We do not, however, rest our decision upon this last principle. Under the present policy clauses, as will be shown, it is sufficient for coverage that the present disability is caused by a post-coverage sickness, even though a concurrent cause of the disability may be a pre-existing disease arguably excluded from coverage by the policy (that is, if it were the sole cause of the disability).

(5)
The long-term disability coverage provides for disability benefits if the insured, while covered, "becomes totally disabled solely because of injury or sickness" from performing his duties, and "if he remains continuously so disabled" for a specified period thereafter. No substantial contention is made that the plaintiff Mitchell is not covered by this clause, except insofar as his pre-existing disease (lipoid proteinosis) may bar recovery.
The definitions section of the contract provides: "`Sickness' wherever used in this policy means sickness or disease commencing while this policy is in force as to the Insured whose sickness is the basis of the claims." (Italics ours.)
Relying on the italicized words, the defendant Equitable contends that disability caused by pre-existing disease is not covered by the contract.
The plaintiff Mitchell contends that, to the contrary, the only pre-existing diseases which bar recovery are those described by a limitations clause of the same contract. In essence, that clause excludes coverage for a disability commencing within the first twelve months of the policy, "if the disability is caused or contributed to by" a disease for which the insured had received medical treatment or taken medication during the three-month period before the coverage commenced.[3]
Mitchell further argues that, at the least, this limitations clause results in an ambiguity as to what pre-existing diseases are excluded ; thus, he relies upon well-settled interpretative principles that ambiguities must be construed in favor of coverage. He urges, finally, that group health policies, commonly issued (as here) without medical examination to cover all of the employees of the group, by usual interpretation exclude only disability resulting *924 from pre-existing disease so described by the "treatment-free" limitations clause, such as that (see footnote 3) here applicable. Meyer, Life and Health Insurance Law, Section 17.2 (1972).
Under the present facts, we do not need to resolve which of the two opposing inter-pretations of the sickness definitions is controlling. If arguendo we accept Equitable's contention that a disability caused solely by a pre-existing disease is not covered, we nevertheless find that the post-coverage ulcer condition is a concurrent cause of the present total disability and thus within the coverage provided by the contract.
The limitations clause itself recognizes that a disability may result both from a pre-existing disease and from a post-coverage sickness. In the event that the disability is "contributed to" by a pre-existing disease, however, the limitations clause bars recovery (when, as here, the disability manifests itself within the first year of coverage) only where the insured received medical treatment or took medication for the pre-existing disease during the three months prior to the inception of the coverage. (See Limitations clause quoted in full in footnote 3, above).
Here, the evidence is uncontradicted that Mitchell did not receive medical treatment or services or take medication for his lipoid proteinosis for well more than three months prior to the time the present disability coverage was afforded to him in 1970.[4]
Therefore, his present disability, which commenced in 1971 results from the ulcer condition which first manifested itself then; thus, it is covered by the contract. Further his recovery therefor is not barred by the circumstance that such disability is concurrently caused or aggravated by his pre-existing disease, for which he had not received treatment or taken medication during its recessive stage during the many months or years prior to commencement of the present disability coverage in 1970.
We are fortified in this interpretation by well-settled principles here applicable. As stated at 13 Appleman, Insurance Law and Practice, Section 7440, pp. 170-71:
"The meaning of disability clauses in insurance policies must be determined largely from the language of the contract itself, interpreted in the light of the particular circumstances of each case. A disability policy is to be construed as a whole, and if such construction be reasonable, to receive that construction which would give effect to every part of the policy. Such provisions should be construed reasonably and given a practical application; or, as otherwise stated, should be given a reasonable, rather than a literal, construction.
"A disability contract must be construed, if possible, so as not to defeat a claim to benefits, since the law does not favor forfeitures. The paramount consideration of the parties at the execution of the contract being insurance against total and permanent disability, any construction of the policy which nullifies such consideration should be avoided. * * *"

Decree
Accordingly, for the reasons assigned, we vacate the judgment of the court of appeal, and we reinstate and affirm the judgment of the district court. All costs of these proceedings are assessed against Equitable, the defendant-appellant-respondent.
COURT OF APPEAL JUDGMENT SET ASIDE, AND DISTRICT COURT JUDGMENT REINSTATED.
NOTES
[1] He also sues the insurer ("Continental") which had formerly provided the coverage. The trial court dismissed the plaintiff's claim against Continental.

The plaintiff appealed the dismissal of his claim against Continental. He did not by his application to this court urge error in that regard. However, if his claim against Continental is before this court, we find no error in the dismissal of the disability claim against Continental for long-term disability which commenced several months after cancellation of Continental's coverage of such loss.
[2] The disease is so rare that none of the medical specialists had ever treated a patient with regard to it. Their opinions are based solely on the sparse medical literature on the subject. Only 200 cases have ever been reported in all medical history. The general practitioner witness estimated that a case of it might not occur in a medical practice but every three hundred years. The patient himself thought it was in the nature of an allergy.
[3] In full, the clause provides:

"No insurance is afforded under the Policy
(a) . . .
(b) . . .
(c) as to a disability commencing during the first twelve months that insurance is in force with respect to the Insured if the disability is caused or contributed to by, or as a consequence of, a disease or injury for which the Insured received medical treatment or services, or took prescribed drugs or medicines, during the three month period prior to the effective date of such insurance; or . . ."
[4] The evidence shows he consulted his physician about his (then non-disabling) throat condition three times during 1967, twice in 1968, and once in 1969 (on May 11). He had no disabling episodes since 1966.